Riva Kornfeld, petitioner,

*v.*

J Otto Kornfeld, defendant.

[Decided October 10th, 1934.]

*Mr. Samuel Tartalsky* and *Mr. Mathew M. Epstein,* for the petitioner.

*Mr. John P. Nugent,* for the defendant.

Van Winkle, A. M.

Before filing answer in this divorce suit, counsel for the husband moved to dismiss the petition and the amended petition, on these grounds: "There is no basis in fact for the petition, and in all truth and honesty the petition does not exhibit the true state of facts, and the latter will preclude all possibility of success." Counsel conceded that the amended petition "is drawn to set forth a cause for divorce on the ground of extreme cruelty; and that on its face it is regular and in every respect in conformity with the practice." But he contended that "since the petition was filed, and again after filing the amended petition, certain affidavits were made and filed in the case by the petitioner, the contents of which unmistakably establish out of the mouth of the petitioner herself that the basic allegations in the

petition and amended petition are untrue, and that the truth as established by her affidavits conclusively shows that she is not entitled to the relief prayed." Counsel's reference is to the affidavits annexed to the wife's two petitions for alimony *pendenle lile,* one of such petitions having been filed after the petition for divorce was filed, and the other having been filed following the filing of the amended petition for divorce.

Counsel for the husband relied upon *Strauss* v. *Rabe, 97 N. J. Eq. 208; 127 Atl. Rep. 188; affirmed, 98 N. J. Eq. 700; 130 Atl. Rep. 920,* and *Tansey* v. *Belleville Relief Association, 99 N. J. Eq. 894; 133 Atl. Rep. 423,* in which cases it was held that where a bill upon its face appears to set forth a valid cause of action, but it is otherwise made to appear by the complainant's own proofs, such as the verifying affidavits or schedules annexed to the bill or otherwise, that in all truth and honesty the bill does not exhibit the true state of facts, and that the latter preclude all possibility of success, there is inherent power in the chancellor to dismiss the bill.

No reason arising out of the peculiar nature of a divorce suit was perceived why the motion to dismiss should not be granted, if it should be granted in an ordinary suit in equity. Rather, the principles governing the procedure of divorce suits favored the motion, or, at the least, did not militate against it. If the matter were to be decided on the affidavits submitted by the wife in support of the two applications for alimony *pendente lite,* it should be said that the wife would not prevail. But, considering that it was to the causes for divorce alleged in the amended petition that the wife had primarily committed herself on oath (*Chancery rule 256a; Riehl* v. *Riehl, 101 N. J. Eq. 15; 137 Atl. Rep. 787*), and that these affidavits might be explained or contradicted on final hearing—and with what effect could not be told—I thought the wife should be given an opportunity to explain or contradict; and so the motion was held until final hearing.

The parties were married on October 29th, 1927. The husband is thirty-seven years old, and the wife about thirty-three. A child was born to them on June 27th, 1933, at

the Margaret Hague Maternity Hospital, Jersey City. The wife, for many years, was continuously employed as a secretary and manager of a service department, receiving $36 a week. The parties lived, from the time of the marriage, in the same house with the wife's two unmarried sisters and the wife's brother and his wife; and the wife admitted that the husband had repeatedly objected to this arrangement.

In October, 1932, five years after the marriage, the pregnancy of the wife obtruded itself. Whether or not the pregnancy was welcome to either the husband or the wife, it appears that it was not anticipated by either; and the wife did not give up her employment until February, 1933.

On November 6th, 1933, the wife filed an amended petition for divorce, on the ground of extreme cruelty, the allegations relied upon being these: That the husband, after learning that the wife had become pregnant, inflicted serious injury to her mental and physical condition, by ordering her to do everything possible to prevent the birth of the child; that he coerced her to be examined by a physician, to ascertain if she was physically capable of bearing a child; that he raged, and harrassed her, demanding that she do away with the child and that he seriously undermined her health while in her pregnant condition; that he actually attempted to put ingredients in her food which would prove fatal to the child. The period to be considered in ascertaining with respect to the charges terminated on May 6th, 1933, a month or so before the child was born, that being six months before the amended petition was filed.

The wife testified that, thinking she was pregnant, she went, of her own volition, to a woman physician, Dr. Mary Carr, who examined her and gave her pills, with the purpose, as she said, of "bringing me around." She said that Dr. Carr told her that she was "built a little small," but that she could have a child; that Dr. Carr said if she wanted to make absolutely sure of being physically able to bear a child Dr. Carr suggested the name of a doctor in New York, to whom she did not go: that she went, of her own choice, to Dr. Cosgrove, a well known Jersey City physician. whose specialty is obstetrics. Dr. Cosgrove examined and treated

the wife seven times, and ultimately delivered her. Dr. Mary Carr testified that after examining the wife she told her that she would not have a very easy labor; that she might have difficulty in bearing the child; and that she would prefer that she would take her case to Dr. Cosgrove and abide by his decision as to whether or not she would be capable of having a child. Dr. Carr admitted that she might have suggested an examination by a physician in New York. The husband testified that Dr. Carr told him, in the presence of the wife, when he went with his wife to Dr. Carr's office, on his wife's second visit there, that the wife has a curvature of the spine, that her vaginal regions or female organs are unusually small, that her pelvic region is small, that it would be a rather precarious undertaking on the part of the wife to go through with the pregnancy. Dr. Cosgrove testified that the wife has a slight curvature of the spine and that her parts are slightly smaller than the average.

The husband had a real fear that his wife was not fit to give birth to a child. He told the physicians that she was "not robust;" and that, in fact, fairly describes the wife, judging from her appearance. Further, he said that her family were "sickly." Dr. Mary Carr said he spoke of tubercular conditions. The wife's own sister had not had an easy time; a child had been taken away from her in a hospital, of which occurrence, as the wife's friendly sister-in-law said, although there was a question as to the reason for the action. "It was either the mother's life or the baby's life," these were the husband's notions and some of the reasons why he held them with respect to his wife's ability to bear a child before the physicians told him of the curvature of the spine and the smallness of the wife's parts, with seeming relation to her ability. Upon learning of these conditions with their presumptive effect on her ability, his fear became intensified. I believe he was sincere in his belief that his wife could not bear a child with safety to herself.

The charges in the amended petition are not substantiated. The husband did not coerce the wife to be examined by a physician during her pregnancy. She was examined by only two physicians, both of her own choice. The

husband did not treat the wife cruelly in the period September, 1932, to May, 1933. During that period the wife enjoyed good physical and mental health. The physician attending her so testified. The husband did not "actually attempt" to put ingredients in the food. At no time was there any blow or violence of any kind nor were there any vile words. When the wife testified at the hearing there was no indication from her appearance that she was suffering from nervous instability. There was no medical testimony at the hearing about her mental or physical condition at that time.

On the hearing, as in the affidavits hereinbefore referred to, it clearly appeared that the wife was in good physical and mental condition up to the birth of the child; and the affidavits and the testimony are to the effect that her nervous instability, appearing after the birth of the child, resulted from the effect of the birth on her. Another Jersey City physician of her own choice, who attended her, stated in affidavits filed on the applications for alimony *pendente lite*, that this nervous instability was to be "attributed a great deal to hyper-thyroidism, which was greatly aggravated by the recent pregnancy;" and he added that the increase in the size of the wife's thyroid gland had increased its function and had resulted in a marked nervous condition, rapid pulse and nervous instability. This physician was not called by the wife to testify at the hearing. Irrespectively of the hyper-thyroidism, when it is stated that the child was born without a left hand, a reason appears why the wife should be afflicted with nervousness after the birth of the child.

The husband went to a rabbi in an endeavor to effect a reconciliation with his wife. The wife's lawyer was called into the conference, and the discussion was chiefly about money. In November, 1933, the husband and wife themselves talked over matters, and the wife asked the husband to settle a certain amount of money on her and the baby. At the hearing the wife testified that she was willing to go back with the husband if he provided enough money for her and the baby. The wife was never in fear of the husband, nor is she now in fear of him. He has done nothing to

inspire any fear. The husband told the rabbi that he would buy a home, he would buy a car, and he would have the bank account in both their names. Apparently the birth and care of the child have brought the wife's employment to a close; and if the husband and wife are to live together again, they will need to live in a home away from the wife's relatives. This would necessitate pecuniary arrangements, and this accounts for these conferences about money.

There was some testimony given, over the objection of counsel for the husband, which was admitted with the idea that it might throw light on or give character to the acts alleged in the period terminating May 6th, 1933, and which testimony was given with more or less exaggeration, respecting what the husband is alleged to have said in the panic time just after the birth of the child upon the discovery of the child's deformity. Obviously, what the husband said then cannot be considered by itself as being an extremely cruel act upon which a decree could be based.

This case is to be decided on a consideration of its peculiar circumstances. I think that the husband's testimony was truthful as to the essential particulars. And the wife's testimony was not substantially different from the case presented by her affidavits on the applications for alimony *pendente lite*. Testing this case by the rule laid down by the court of errors and appeals, in *Bonardi* v. *Bonardi, 113 N. J. Eq. 25* (at *p. 27*); *166 Atl. Rep. 207,* I find that the wife is not entitled to a decree, and I will advise a decree dismissing her amended petition.